No. _____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JEREMY JAEGER, *et al.*,
*Plaintiffs-Respondents,*

v.

ZILLOW GROUP, INC., *et al.*,
*Defendants-Petitioners.*

**On Petition for Permission to Appeal from The United States District Court for the Western District of Washington, No. C21-1551 TSZ**
**The Honorable Thomas S. Zilly**

## DEFENDANTS-PETITIONERS' PETITION FOR PERMISSION TO APPEAL FROM ORDER GRANTING CLASS CERTIFICATION
### Federal Rule Of Civil Procedure 23(f)

Peter B. Morrison
*Counsel of Record*
Virginia F. Milstead
Winston P. Hsiao
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone: (213) 687-5000
peter.morrison@skadden.com

Sean C. Knowles
Zachary E. Davison
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Telephone: (206) 359-8000
sknowles@perkinscoie.com

*Attorneys for Defendants Zillow Group, Inc., Richard N. Barton, Allen W. Parker, and Jeremy Wacksman*

## <u>DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Ninth Circuit Rule 21-3, petitioners state as follows: Defendant Zillow Group, Inc. ("Zillow") does not have a parent corporation, and no publicly held corporation owns 10% or more of Zillow stock.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT..................................................................ii

TABLE OF CONTENTS.....................................................................iii

TABLE OF AUTHORITIES ................................................................ iv

INTRODUCTION AND RELIEF SOUGHT ......................................... 1

QUESTIONS PRESENTED ................................................................. 6

STATEMENT OF CASE...................................................................... 6

    I.    Background Of Zillow Offers ................................................. 6

    II.    A Sudden Change In The Housing Market Results In An
            Unanticipated Write-Down And The Decision To Wind Down
            ZO .................................................................................... 7

    III.    Securities Litigation Begins And The District Court Certifies A
            Class ................................................................................ 8

LEGAL STANDARD FOR RULE 23(f) PETITIONS ........................... 9

REASONS FOR GRANTING INTERLOCUTORY REVIEW ............... 10

    I.    Fraud-On-The-Market And Inflation Maintenance Are Critical
          Doctrines For Resolving Class Certification In Securities Actions ....... 10

    II.    The Petition Presents The Unsettled And Fundamental Issue Of
          The Standard For Demonstrating A "Mismatch" Under *Goldman*.......... 12

    III.    The Absence Of Guidance In The Ninth Circuit Leads To
          Conflicting Opinions And Manifest Error................................. 15

CONCLUSION ................................................................................ 20

CERTIFICATE OF COMPLIANCE .................................................. 22

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*,
  568 U.S. 455 (2013) ............................................................... 2, 10

*In re Apple Inc. Securities Litigation*,
  No. 4:19-cv-2023-YGR,
  2022 WL 354785 (N.D. Cal. Feb. 4, 2022) ....................... 5, 15

*Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*,
  77 F.4th 74 (2d Cir. 2023) ............................................... passim

*In re Asacol Antitrust Litigation*,
  907 F.3d 42 (1st Cir. 2018) ..................................... 1, 9, 12, 15

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ........................................................... 10

*In re BofI Holding Inc. Securities Litigation*,
  977 F.3d 781 (9th Cir. 2020) ............................................ 14

*Chamberlan v. Ford Motor Co.*,
  402 F.3d 952 (9th Cir. 2005) .......................................... passim

*Cooper v. Thoratec Corp.*,
  No. 14-cv-0360 CW,
  2018 WL 2117337 (N.D. Cal. May 8, 2018) ..................... 5, 15

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ........................................................ 2, 14

*Ferris v. Wynn Resorts Ltd.*,
  No. 2:18-cv-00479-APG-DJA,
  2023 WL 2337364 (D. Nev. Mar. 1, 2023) ....................... 4, 15

*In re FibroGen Securities Litigation*,
  No. 21-cv-02623-EMC,
  2024 WL 1064665 (N.D. Cal. Mar. 11, 2024) ..................... 18

*In re Genius Brands International, Inc. Securities Litigation,*
    97 F.4th 1171 (9th Cir. 2024) ................................................................. 13

*Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System,*
    594 U.S. 113 (2021) ................................................................passim

*Halliburton Co. v. Erica P. John Fund, Inc.,*
    573 U.S. 258 (2014) ................................................................2, 10, 11

*In re Mattel, Inc. Securities Litigation,*
    No. 2:19-cv-10860-MCS-PLA,
    2021 WL 4704578 (C.D. Cal. Oct. 6, 2021) ...................................... 5, 15

*Mineworkers' Pension Scheme v. First Solar Inc.,*
    881 F.3d 750 (9th Cir. 2018) .................................................................. 14

*Pearlstein v. BlackBerry, Ltd.,*
    No. 13 Civ. 7060 (CM),
    2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ...................................... 5, 15

## INTRODUCTION AND RELIEF SOUGHT

In *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.* ("*Goldman*"), 594 U.S. 113 (2021), the Supreme Court set out the standard courts must use to determine whether a securities litigation defendant has successfully rebutted a presumption of reliance in a so-called "inflation maintenance" case sufficient to defeat class certification. This Court has never addressed *Goldman*, leaving an absence of guidance within the Ninth Circuit. Consequently, courts within the Ninth Circuit, including the District Court here, have improperly applied (and in some cases ignored) *Goldman*. This has created a conflict between decisions in the Ninth Circuit and the Second Circuit's well-reasoned decision in *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.* ("*Goldman II*"), 77 F.4th 74 (2d Cir. 2023), concerning the standard for evaluating whether a presumption of reliance has been rebutted. Because securities class actions rarely reach trial, granting a Rule 23(f) petition may be the only opportunity the Ninth Circuit has to resolve this important issue on which federal courts are split and bring the Ninth Circuit in line with *Goldman* and *Goldman II. See Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 958 (9th Cir. 2005) ("orderly development of law" is a factor to grant petition); *In re Asacol Antitr. Litig.*, 907 F.3d 42, 47 (1st Cir. 2018) (granting petition when federal courts are "split" on class certification "issues").

In federal securities actions, class certification motions often come down to one issue—whether the plaintiff can invoke a presumption that the proposed class relied on the alleged misstatements at issue pursuant to the "fraud-on-the-market"

theory or whether the defendant can rebut that presumption by showing that the alleged misstatements did not actually impact the price of the defendant's stock. This is a central inquiry—every Supreme Court case to consider certification of a securities class action in the last thirteen years has addressed the fraud-on-the-market doctrine. *See Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton*"), 563 U.S. 804 (2011); *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 467 (2013); *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 284 (2014).

In 2021, the Supreme Court in *Goldman* for the first time considered the fraud-on-the-market presumption of reliance in a so-called "inflation maintenance" case—a case in which a plaintiff does not contend that the alleged misstatement caused the defendant company's stock price to *rise*, but rather that the alleged misstatement kept the stock price from *declining. Goldman*, 594 U.S. at 120. In doing so, the Court held that to rebut the fraud-on-the-market presumption in inflation maintenance cases, the defendant could show "there is a mismatch between…the misrepresentation and the corrective disclosure." *Id.* at 123. In other words, a defendant could rebut the presumption when the alleged corrective disclosures that supposedly reveal the prior alleged misstatements do not *actually show* that the alleged misstatements are false. In assessing such arguments, the Supreme Court held that a district court must "assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Id.* at 127.

Following *Goldman*, and after granting a Rule 23(f) petition, the Second Circuit

2

applied the Supreme Court's mandates and set forth the standard a defendant must meet in the Second Circuit to show when a mismatch between the alleged misstatement and the corrective disclosure has occurred sufficient to rebut the fraud-on-the-market presumption in an "inflation maintenance" case. *See Goldman II*, 77 F.4th at 74. Specifically, the Second Circuit held that, in light of *Goldman*, whether a defendant has sufficiently shown a mismatch to rebut the presumption "is a different question than loss causation," an element of a securities fraud claim that requires the plaintiff to show the alleged fraud caused its loss. *Id.* at 99 n.11. Under *Goldman II*, a mere "subject matter match" between the alleged misrepresentation and corrective disclosure—the typical standard for loss causation—is insufficient to sustain the "inflation maintenance" theory. *Id.* at 101. Instead, "any gap among the front- and back-end statements as written [must] be limited" to ensure that the corrective statements "*expressly and specifically negat[e]*" the misstatement or "*directly render*[]" it false. *Id.* at 98-99.[1] When a gap between the statements exists, the court must consider "indirect evidence," such as whether analysts referenced the alleged misstatements after the corrective disclosures. *Id.* at 102.

    The Second Circuit's analysis makes good sense. In an inflation maintenance case, the plaintiff claims that the amount the company's stock price dropped after a corrective disclosure is the same amount by which it would have dropped sooner but

---

[1] Unless noted, emphases are added, and internal citations and quotations are omitted.

for the alleged misstatements that *maintained* the earlier price. *Id.* at 80. That theory "starts to break down," however, when there is a "mismatch" between the information in the alleged misstatements and the corrective disclosure. *Id.* at 89. In a "mismatch" scenario, "it is less apparent that the market would understand" the corrective disclosure as having revealed the falsity of the company's earlier statements, calling into question whether any stock price drop following the alleged corrective disclosure truly equals the amount the stock price would have dropped earlier but for the alleged misstatements maintaining the price. *Id.* at 80-81, 99. That is why there must be a "close[] fit" between the alleged misstatements and alleged corrective disclosure in an inflation maintenance case. *Id.* at 99 n.11.

To date, the Ninth Circuit has never considered or applied *Goldman* or *Goldman II*. As such, it has not established a standard concerning when an alleged misstatement and corrective disclosure are sufficiently "mismatched" to rebut the fraud-on-the-market presumption, how the "mismatch" inquiry differs from loss causation, or what it means to "take into account *all* record evidence relevant to price impact, regardless whether that evidence overlaps" with the merits. *Goldman*, 594 U.S. at 123, 124.

Without such guidance, courts within the Ninth Circuit, like the District Court here, have confused the standard for loss causation with the separate standard for rebutting the presumption of reliance, and by doing so, have created a conflict with the Second Circuit's *Goldman II* decision. *See, e.g., Ferris v. Wynn Resorts Ltd.*, 2023 WL 2337364, at *10 (D. Nev. Mar. 1, 2023) (citing loss causation case as standard for

4

rebutting inflation maintenance); *In re Apple Inc. Sec. Litig.*, 2022 WL 354785, at *9 (N.D. Cal. Feb. 4, 2022) (citing *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *18 (S.D.N.Y. Jan. 26, 2021), which applied loss causation standards pre-*Goldman II*); *In re Mattel, Inc. Sec. Litig.*, 2021 WL 4704578, at *4-5 (C.D. Cal. Oct. 6, 2021) (citing loss causation analysis to conclude there was no mismatch); *Cooper v. Thoratec Corp.*, 2018 WL 2117337, at *4 (N.D. Cal. May 8, 2018) (similar).

Here, the District Court only deepened this split. While citing *Goldman* and *Goldman II*, the District Court followed neither. Instead, the District Court applied a loss causation standard—which *Goldman II* rejected—rather than examining whether a "mismatch" existed. *Goldman II*, 77 F.4th at 99 n.11. The District Court further based its findings almost entirely on the allegations in the complaint, rather than on the *Goldman*-required assessment of "all the evidence of price impact," which included a detailed expert report from Defendants. The District Court also committed manifest error when it refused to consider Defendants' evidence because such evidence went to the merits rather than class certification—an approach *Goldman* expressly rejects.

Unfortunately, absent guidance from this Court, this case will not be the last to run afoul of *Goldman* or expand the conflict with the Second Circuit. This Rule 23(f) petition provides the Ninth Circuit the opportunity to address these critical questions. Thus, this Court should grant this Petition to address for the first time the standards announced in *Goldman* and *Goldman II*, resolve the split with the Second Circuit, and in doing so, correct the District Court's erroneous decision below. *See Chamberlan*, 402

F.3d at 959 (Rule 23(f) petition appropriate when unsettled legal questions would evade review).

## QUESTIONS PRESENTED

1. Did the District Court err by substituting the standard for loss causation for the proper standard for assessing whether, under *Goldman*, a defendant has shown a lack of price impact sufficient to rebut the fraud-on-the-market presumption due to a "mismatch" between the alleged misstatements arguably causing price inflation and the purported corrective disclosures removing such alleged inflation, such that "back-end price" declines cannot legitimately measure purported "front-end inflation?"

2. In contravention of *Goldman*, did the District Court err in failing to "take into account *all* record evidence relevant to price impact, regardless whether that evidence overlaps with materiality or any other merits issue," in assessing whether Defendants rebutted the fraud-on-the-market presumption?

## STATEMENT OF CASE

### I.    Background Of Zillow Offers

In April 2018, Zillow launched Zillow Offers ("ZO"), its "iBuying" business, in which Zillow would purchase homes directly from sellers, perform renovations, and re-sell the homes for a small profit margin. (EX189.) In late 2020 or early 2021, the real estate market experienced unprecedented growth in home price appreciation ("HPA"). (EX199, 201, 205-06.) Zillow's forecasting was not keeping up with the market, and so Zillow was (i) making a greater profit on the homes it bought and sold

6

than intended; and (ii) acquiring fewer homes than it needed to scale. (*Id.*)

In March or April 2021, Zillow launched a set of initiatives to catch up to its acquisition and profit margin goals, known internally as "Project Ketchup." As early as its May 4, 2021 earnings call, Zillow disclosed the substance and aims of the Project Ketchup initiatives (although not the project name itself), including: (i) improving pricing by adjusting Zillow's algorithms and models to keep pace with growth in HPA and to make its offers more competitive; and (ii) reducing the scope and cost of after-purchase renovation projects, with savings passed on to the home seller, thus making Zillow's purchase offers even more competitive. (EX201, 205, 208.)

On its August 5, 2021 earnings call, Zillow spoke further on these initiatives. It explained that it had increased acquisitions, and that "this step-up in pace . . . result[ed] from the progress we have made in strengthening our pricing models." (EX221.) It also disclosed that "we saw rapid conversion gains throughout the quarter as we improved our offer strength." (EX217.) Zillow also noted "largely durable operational improvements" in renovation, holding, and selling costs. (EX220.)

On September 13, 2021, a Zillow executive participated in the Piper Sandler 2021 Virtual Global Technology Conference and repeated several of the statements Zillow previously made on August 5, 2021. (EX234, 236-37.)

## II.    A Sudden Change In The Housing Market Results In An Unanticipated Write-Down And The Decision To Wind Down ZO

In the summer of 2021, HPA suddenly and precipitously slowed. (EX255.) As

a result, Zillow's earlier adjustments to pricing began to overshoot, resulting in offer prices above later resale prices. (EX248, 250, 255.) Ultimately, on its November 2, 2021 earnings call, Zillow announced it was (i) writing down over $500 million in home inventory; and (ii) winding down ZO, because the housing market was too volatile for Zillow's pricing projections, and the potential losses moving forward could jeopardize its entire business. (EX247-48.)

## III. Securities Litigation Begins And The District Court Certifies A Class

Upon the announcement of the ZO wind-down, the market reacted to the news Zillow was ending a business segment, and this lawsuit followed. Plaintiff alleges Zillow's August 5, 2021 and September 13, 2021 statements related to (i) its reliance on and improvements to its algorithms; (ii) its attributing Zillow's inventory growth to consumer demand; and (iii) the durability of operational, unit economic, and/or renovation process improvements were misleading because Zillow did not adequately disclose Project Ketchup. (EX500-02, 505-07.) Specifically, as to categories (i) and (ii), Plaintiff claims that, while Zillow stated its increase in acquisitions was due in part to improvements to its pricing model, Zillow concealed that it had also manually applied what it called "gross price overlays" ("overlays") to offer prices to keep up with HPA where the algorithm did not, and that these overlays are what created demand. (EX502-04.) As to category (iii), Plaintiff claims Zillow concealed that it cut costs by reducing the scope and pay of renovation projects, causing contractors to "de-prioritiz[e]" Zillow or "declin[e] jobs altogether." (EX503-04.)

On August 23, 2024, after full briefing but without oral argument, the District Court granted Plaintiff's motion to certify a class of investors who purchased Zillow common stock between August 5, 2021 and November 2, 2021. In doing so, the District Court did not apply a legal standard applicable to whether Plaintiff could properly invoke a presumption of reliance under an "inflation maintenance" theory for purposes of class certification, much less consider Defendants' expert evidence in this regard. Rather, the District Court wrongly applied a loss causation standard, accepting Plaintiff's *allegations* as true. In doing so, it concluded that Plaintiff had adequately alleged that disclosures on October 17 and 18, October 31 and November 1, and November 2, 2021 were "corrective disclosures," as that term is defined in case law assessing loss causation. (EX15-18.)

## LEGAL STANDARD FOR RULE 23(f) PETITIONS

This Court has "unfettered discretion" to grant a Rule 23(f) petition for leave to appeal a class certification order that "presents an unsettled and fundamental issue of law relating to class actions, important both to the specific litigation and generally, that is likely to evade end-of-the-case review," or that is "manifestly erroneous." *Chamberlan*, 402 F.3d at 957-59. Courts find it particularly appropriate to grant review when the "district court's order certifying the class raises issues on which" federal courts "are split and that are likely to arise in other cases in this circuit before an appeal from a final judgment would—if ever—ripen." *Asacol*, 907 F.3d at 47.

## REASONS FOR GRANTING INTERLOCUTORY REVIEW

**I.    Fraud-On-The-Market And Inflation Maintenance Are Critical Doctrines For Resolving Class Certification In Securities Actions**

When plaintiffs seek to certify claims asserted under the Securities Exchange Act of 1934, they must prove, among other things, that they relied on alleged misstatements in deciding to purchase or sell a security. *See Halliburton II*, 573 U.S. at 268. To meet this burden, plaintiffs often invoke the fraud-on-the-market presumption of reliance, which creates a presumption that plaintiffs relied on the alleged misstatements so long as, among other things, the stock at issue trades in an efficient market. *Id.* According to the theory, "the market price of shares traded on well-developed markets"—known as efficient markets—"reflects all publicly available information, and, hence, any material misrepresentations." *Id.* If a company whose stock trades in an efficient market makes an alleged misstatement, the price of that stock will incorporate that alleged misstatement by inflating the price of that stock. *See Amgen*, 568 U.S. at 462. Thus, when plaintiffs buy the stock at the allegedly inflated price, the court presumes that they relied on the alleged misstatement. *Id.*

Defendants can rebut the fraud-on-the-market presumption if they show the alleged misstatements did not impact the stock price. *See Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988). If the alleged misstatements did not impact the stock price, "the basis for finding that the fraud had been transmitted through market price would be gone," *id.*, and there is, in turn, no basis to presume the plaintiff relied on the alleged

10

misrepresentations, *Halliburton II*, 573 U.S. at 283.

In *Goldman*, 593 U.S. at 119-20, the Supreme Court, for the first time, addressed an "inflation maintenance" theory of fraud-on-the-market. The Court explained: "Under the theory, price impact is the amount of price inflation maintained by an alleged misrepresentation—in other words, the amount that the stock's price would have fallen 'without the false statement.'" *Id.* at 123.

> Plaintiffs typically try to prove the amount of inflation indirectly: They point to a negative disclosure about a company and associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation.

*Id.* However, that "inference—that the back-end price drop equals the front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Id.*

The defendant in *Goldman* argued that, because the alleged misstatements were generic—such as "We have extensive procedures and controls that are designed to identify and address conflicts of interest"—there was a mismatch between the statements and the corrective disclosures, which allegedly revealed specific conflicts of interest raised in a government enforcement action. *Id.* at 120. The Court observed, "[u]nder those circumstances, it is less likely that the specific disclosure actually corrected the generic misrepresentation, which means there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *Id.*

Concluding it was not clear whether the lower courts considered the generic

11

nature of the misstatements at issue, the Court remanded, holding that defendants must prove lack of price impact by a preponderance of the evidence, and that lower courts "must take into account *all* record evidence relevant to price impact, regardless whether that evidence overlaps with materiality or any other merits issue." *Id.* at 124.

## II.    The Petition Presents The Unsettled And Fundamental Issue Of The Standard For Demonstrating A "Mismatch" Under *Goldman*

Against this backdrop, this Petition raises the "unsettled and fundamental issue," *Chamberlan*, 402 F.3d at 955, of what standard applies in the Ninth Circuit for determining whether a defendant has demonstrated a "mismatch" between an alleged misstatement and an alleged corrective disclosure sufficient to show a lack of price impact and rebut any presumption of reliance under an "inflation maintenance" theory. That is, how closely does the information in the back-end corrective disclosure have to match the information in the front-end alleged misstatements for a court to accept that any stock price drop on the back-end serves as a proxy for the amount of alleged inflation on the front-end? The Ninth Circuit has never addressed this question, leading to a conflict between courts within the Ninth Circuit and the Second Circuit that merits this Court's attention. *See Asacol*, 907 F.3d at 47.

In *Goldman II*, the Second Circuit, after granting a Rule 23(f) petition, reversed a grant of class certification and held that the information in an alleged misstatement and later supposedly corrective disclosure must closely match to infer price impact under an inflation maintenance theory. *Goldman II*, 77 F.4th at 99. A generalized

"subject-matter match" between the alleged misstatement and later disclosure is *insufficient* to support an inference that the back-end price drop equaled the front-end inflation. *Id.* at 93. Rather, the alleged corrective disclosure must "*expressly and specifically* negat[e] the alleged false statement," *id.* at 98, or "*directly render[] false* the company's affirmative misrepresentations," *id. Goldman* further "requires that any gap among the front- and back-end statements as written be limited." *Id.* at 99. If a gap exists, the court must examine "other indirect evidence of price impact," such as whether analysts referenced the alleged misstatements when the alleged corrective disclosures were made. *Id.* at 102-05.

While the District Court referenced *Goldman* and *Goldman II* (EX14-15), it did not apply their standards. Rather, the District Court incorrectly stated that, under an inflation maintenance theory, "*any* drop in Zillow's stock price after the disclosure of corrective information serves as a proxy for the price effect of misleading statements" (EX14-15), without examining whether the alleged corrective disclosure "expressly and specifically negat[ed] the alleged false statement," *Goldman II*, 77 F.4th at 98, or "directly rendered false the company's affirmative misrepresentations." *Id.*; *see also id.* at 99 (court must examine whether there is a "gap among the front- and back-end statements as written"). The District Court then considered whether the alleged back-end disclosures qualified as "corrective disclosures" for purposes of loss causation. (EX15 (citing *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1184 (9th Cir. 2024) (reversing dismissal based on failure to *plead* loss causation and noting that a

"corrective disclosure . . . need not 'precisely mirror' the misrepresentation"); *In re BofI Holding Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020) (reversing in part dismissal based on failure to *plead* loss causation and noting that a plaintiff must allege "the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading"); *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753-54 (9th Cir. 2018) (discussing ways loss causation can be pleaded and proved)).) The District Court incorrectly reasoned that, because Plaintiff's complaint *alleged* that the back-end statements qualified as "corrective disclosures" under the loss causation standard, Defendants failed to prove lack of price impact. (EX16-18.)

The District Court applied the wrong legal standard. "Loss causation addresses a matter different from whether an investor relied on a misrepresentation, presumptively or otherwise, when buying or selling stock." *Halliburton*, 563 U.S. at 812. Accordingly, as the Second Circuit has explained, "the question here—whether there is a basis to infer that the back-end price equals front-end inflation—is *a different question from loss causation*, and, in light of *Goldman*, requires a closer fit (even if not precise) between the front- and back-end statements." *Goldman II*, 77 F.4th at 99 n.11.

The standards for loss causation and for rebutting the inflation maintenance theory are necessarily separate. If a plaintiff's *pleading* of a corrective disclosure under a loss causation standard, by itself, is sufficient to defeat any rebuttal of the inflation maintenance theory (as the District Court found here), then a defendant could *never* rebut the fraud-on-the-market presumption. The pleading alone would be the first

14

and last word on the matter, and there would be no need to adjudicate the issue in determining class certification. That result would defy law and common sense alike.

Other courts within the Ninth Circuit have also confused loss causation with the standard for determining price impact. *See, e.g.*, *Ferris*, 2023 WL 2337364, at *10 (citing loss causation case as standard to rebut inflation maintenance); *Apple*, 2022 WL 354785, at *9 (citing *Pearlstein*, 2021 WL 253453, at *18, applying pre-*Goldman II* loss causation standard); *Mattel*, 2021 WL 4704578, at *4-5 (citing loss causation analysis to find no mismatch); *Cooper*, 2018 WL 2117337, at *4 (similar). Absent guidance from this Court, the conflict between decisions within the Ninth Circuit and the Second Circuit's *Goldman II* decision will only continue to deepen. *See Chamberlan*, 402 F.3d at 959; *Asacol*, 907 F.3d at 47.

## III. The Absence Of Guidance In The Ninth Circuit Leads To Conflict With The Second Circuit And Manifest Error

This case shows why (1) application of the appropriate standard to assess whether a "mismatch" rebuts the fraud-on-the-market presumption and (2) compliance with the Supreme Court's requirement to "assess all the evidence of price impact," *Goldman*, 594 U.S. at 127, are critical in putative securities class actions, and underscores the need for Ninth Circuit guidance where none currently exists. *See Chamberlan*, 402 F.3d at 958 (Rule 23(f) should "facilitate the development of the law").

### A. The District Court Did Not Consider "Mismatch"

Plaintiff alleges Defendants made misstatements on two dates—August 5 and

15

September 13, 2021—related to (i) Zillow's reliance on, and improvements to, its pricing algorithms in ZO; and (ii) the durability of operational improvements in ZO. (EX500-07.) Plaintiff claims these statements maintained inflation in Zillow's stock price because the market did not know that (i) Zillow used overlays to increase offer prices; and (ii) Zillow reduced the scope and pay of renovation projects, which caused contractors to "deprioritiz[e]" Zillow jobs. (EX502-04.) Under *Goldman II*, a corrective disclosure that "actually corrected" the alleged August 5, 2021 and September 13, 2021 statements should "expressly and specifically negat[e]" them or "directly render[]" them false. *Goldman II*, 77 F.4th at 98. Thus, any corrective disclosure should refer back to those statements or disclose the information Plaintiff alleges was misleadingly omitted—the use of overlays or contractor shortages.

The alleged corrective disclosures here did not do that. None of the allegedly corrective disclosures on any of five different dates—October 17, October 18, October 31, November 1 or November 2—said anything about Zillow's statements about improving its pricing algorithms or making durable operational improvements. None of the disclosures mentioned overlays or contractor shortages. On the contrary, the use of overlays and alleged contractor shortages was not disclosed at all until *after* the class period, when *The Wall Street Journal* reported on them, and that article had no effect on Zillow's stock price. (EX128-31.) Applying the proper standard, the District Court should have concluded that there was a "mismatch" between the corrective disclosures and the alleged misstatements, and that the corrective disclosures thus

16

cannot "operate[] as an indirect proxy for the front-end inflation." *Goldman II*, 77 F.4th at 80. Instead, the District Court rejected Defendants' mismatch argument because the allegations in the complaint sufficiently alleged loss causation.

### B. The District Court Failed To Consider Properly Other Indirect Evidence Of Price Impact

Had the District Court properly applied the *Goldman II* standard and assessed the "mismatch" between the alleged corrective disclosures and alleged misstatements here, it would have gone on to "consider other indirect evidence of price impact" to determine whether the "back-end price drop equals front-end inflation." *Goldman II*, 77 F.4th at 80, 102. An assessment of that evidence—consistent with the Supreme Court's directive to "be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense," *Goldman*, 594 U.S. at 122—would have led to the unavoidable conclusion that the alleged corrective disclosures here had nothing to do with the alleged misstatements, and therefore, the alleged misstatements had no price impact.

For example, two of the alleged corrective disclosures—a report from KeyBanc on October 31, 2021 and Zillow's November 2, 2021 earnings call—reported that Zillow had overpaid for homes. The KeyBanc report stated that 66% of Zillow's homes were for sale below their purchase price. (EX308.) "Across the entire sample set," KeyBanc reported, "the value weighted pricing was a 2.0% discount vs. purchase price." (*Id.*) The November 2, 2021 earnings call reported, among other things, that

Zillow was winding down ZO in part because it had "been unable to accurately forecast future home prices at different times in both directions." (EX248.)

These corrective disclosures could "do the work of proving front-end price impact," *Goldman II*, 77 F.4th at 99, only if they disclosed something new. "[D]isclosure of purportedly omitted information before a stock drop demonstrates a lack of price impact." *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *12 (N.D. Cal. Mar. 11, 2024). That Zillow had overpaid for homes and failed to accurately forecast prices—based on analysis of publicly available data—had already been publicly disclosed multiple times. On October 4, 2021, RBC Capital Markets reported as much, and from October 19 through October 29, at least seven analyst or news reports demonstrated that Zillow was listing homes for resale at prices lower than for what it purchased them. (EX114-17; 318-418.) Some reports stated that Zillow had "tweaked the algorithms that power its home-flipping operation to make higher offers" and that "[s]lowing price appreciation means it will sell many homes at a loss." (EX390.) On October 28, 2021, a Bank of America analyst reported, just as KeyBanc did several days later, "on average Zillow is selling for 2% less than the purchase price" and "current selling prices are 6% lower than the initial price." (EX396.) Yet none of these disclosures was followed by a statistically significant decline in the price of Zillow stock. If these reports had no effect on Zillow's stock price, the KeyBanc report and November 2, 2021 earnings call repeating the same information could not have had any effect either. Yet, apparently relying on Plaintiff's complaint and the loss

18

causation standard, the District Court failed to consider this evidence meaningfully, all in violation of the Supreme Court's directive that it "must take into account *all* record evidence relevant to price impact." *Goldman*, 594 U.S. at 124; (*see* EX17 (mischaracterizing Defendants' argument as being that the KeyBanc report "contained already public information" and rejecting it based on loss causation law).)

Similarly, with respect to each corrective disclosure, Defendants submitted expert evidence analyzing analyst commentary and opining that the resulting stock price declines were due to factors unrelated to the alleged misstatements. For example, with respect to the October 17 and October 18 disclosures announcing a pause in home acquisitions due to a backlog in renovations, analysts attributed the pause to issues unrelated to Plaintiff's claims—the "economy-wide labor shortage," "market softening," or "Zillow's untimely increase in home acquisitions." (EX110-12.)

As for the stock price decline following the November 2, 2021 earnings call announcing the wind-down of ZO, Defendants' expert explained that it "reflects Zillow's strategic decision in the face of previously disclosed difficulties of the iBuyer industry." (EX124.) In other words, the stock price declined because Zillow was shutting down a major business segment, not because the market suddenly understood Zillow's statements from months earlier about improving its pricing models and durable operational improvements to be false. If the stock price declines were unrelated to the alleged misstatements, these disclosures cannot serve as an "indirect proxy for the front-end inflation." *Goldman II*, 77 F.4th at 80.

Again, the District Court refused to consider this evidence, remarking that it "goes to loss causation and the merits of [Plaintiff's] and the putative class's claims." (EX16.) Under *Goldman*, however, a district court must consider "*all* record evidence relevant to price impact, regardless whether that evidence overlaps" with a merits issue. *Goldman*, 594 U.S. at 124. It was directly contrary to *Goldman* to reject Defendants' expert evidence simply because it overlapped with a merits issue.

Finally, Defendants submitted evidence showing that, when the alleged misstatements were made, they caused no increase in Zillow's stock price because they repeated previously disclosed information. If the alleged misstatements had no effect when they were made, it suggests the market thought little of them. And if the market thought that little of them, it cannot follow that the statements "maintained" an alleged $11 billion worth of inflation in the price of Zillow stock. Nor is it reasonable to conclude that the later disclosures somehow revealed those statements to be false. Had the District Court applied the *Goldman* standard, it would have considered this evidence, along with all other evidence of price impact—as part of the "good dose of common sense" that governs the price impact inquiry. *Goldman*, 594 U.S. at 121. However, the District Court refused. (EX14-15.)

## CONCLUSION

The Court should grant the Petition to resolve a deepening split with the Second Circuit, and provide for the first time guidance about how courts within the Ninth Circuit, including the District Court below, should properly apply *Goldman*.

DATED:  September 6, 2024          Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____/s/ Peter B. Morrison_____
                    Peter B. Morrison
                    Attorneys for Defendants-Petitioners

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the page limitations set forth in Ninth Circuit Rule 5-2(b) and does not exceed 20 pages. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Garamond 14-point font.

DATED:  September 6, 2024                          Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____ /s/ Peter B. Morrison _____
                    Peter B. Morrison
            Attorneys for Defendants-Petitioners

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)**

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are __NOT__ Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

- Please see attachment

**Description of Document(s)** *(required for all documents)*:

- Defendants-Petitioners' Petition for Permission to Appeal from Order Granting Class Certification
- Exhibits to Defendants-Petitioners' Petition for Permission to Appeal from Order Granting Class Certification

**Signature** /s/Peter B. Morrison    **Date** Sep 6, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15**                                                                 *Rev. 12/01/2018*

Steve W. Berman
Catherine Y. N. Gannon
Sean R. Matt
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
catherine@hbsslaw.com
sean@hbsslaw.com

Reed R. Kathrein
Lucas E. Gilmore
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Raffi Melanson
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1 Faneuil Hall Sq., 5th Floor
Boston, MA 02109
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
raffim@hbsslaw.com

*Lead Counsel for Lead Plaintiff Jaeger*

Stacey M. Kaplan
**KESSLER TOPAZ MELTZER & CHECK, LLP**
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415)400-3000
Facsimile: (415)400-3001
skaplan@ktmc.com

Gregory M. Castaldo
Evan R. Hoey
**KESSLER TOPAZ MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706

Facsimile: (610) 667-7056
gcastaldo@ktmc.com
ehoey@ktmc.com

*Additional Counsel for Lead Plaintiff Jaeger*